quickie refund that was set off against pre-petition taxes.

The way to avoid this problem is to hold that § 503(b)(1)(B)(ii) requires the IRS to pay the quickie refund to the bankruptcy estate without setting off any pre-petition tax debts. If the quickie refund must be paid to' the bankruptcy estate, then it makes sense to give administrative expense priority to the claim the IRS will have if it subsequently revokes the refund. The IRS will have a post-petition claim for money paid to the bankruptcy estate.

There are several finer points that can be added to make the argument more convincing, but there are also several counter arguments. Indeed, the argument suggests that § 503(b)(1)(B)(ii) does not apply.

Neither party has briefed the questions raised by § 503(b)(1)(B)(ii). The court will order the parties to brief the question within a short time. Pending a decision, the court cannot allow setoff. However, the court will not order the IRS to pay the quickie refund to the bankruptcy trustee. The court will grant partial summary judgment on the issues decided.

· The court will enter an order. This memorandum is the court's findings of fact and conclusions of law. FED.R.BANKR.PROC. 7052 (West 1984).

**In re Jeffrey GROSSMAN, Debtor.**

**WESTBANK, Westbank/Naperville, West-bank/Will County, and Westbank Financial Corporation, Plaintiffs/Counterde-fendants,**

v.

**Jeffrey E. GROSSMAN, Defendant/Counterplaintiff.**

**Bankruptcy No. 92 B 1534.**

**Adv. No. 92 A 1242.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Jan. 12, 1994.

Carolyn Suzzi, Schillerstrom & Cresto, Naperville, IL, for plaintiffs.

David N. Missner, M. Gretchen Silver, Rudnick & Wolfe, Chicago, IL, for defendant.

*MEMORANDUM OPINION ON MOTION TO DISMISS COUNTERCLAIM*

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary Complaint relates to the bankruptcy proceeding of debtor Jeffrey E.

Grossman ("Grossman") now pending under Chapter 7 of the Bankruptcy Code, Title 11 U.S.C. The plaintiff group of bank entities (collectively "Westbank" or "Westbank entities") sued Grossman in this Adversary proceeding. He counterclaimed. His Amended Counterclaim is now pending. In it, he seeks to assert a tort action under Illinois law for intentional interference with prospective business expectancy. He says that the counterdefendants liquidated certain Certificates of Deposit to apply against a loan, thereby breaching their undertaking not to do so. As a result, the partnership in which Grossman was a 1% partner lost an assertedly valuable right to purchase certain stock, in which he claims he had an economic expectancy.

Counter-defendants moved to dismiss. The motion is treated under Fed.R.Bankr.P. 7012 (Fed.R.Civ.P. 12(b)(6)). For reasons stated below, the motion is allowed and the counterclaim is dismissed. Because this is Grossman's second pleading effort, and because, as a matter of law, he cannot plead the intended cause of action, the dismissal is made final and appealable.

### Facts Pleaded

While convoluted, the history underlying the counterclaim is easily stated. The relationship of the parties and other entities is summarized in the following chart of facts as they are pleaded in the Amended Counterclaim:

As charted above, part of Bankers Trust loan to NAPP went on to NAI through NAGL. NAI was undercapitalized and needed the $2,675,000.00 thus received to operate under requirements of the Wisconsin Insurance Commissioner. The NAI stock and the NAGL stock owned by NAPP became part of the collateral to Bankers Trust for its loan, so the loan agreement barred any unpermitted debt or liens that would devalue that stock.

After NAI received the $2,675,000.00, it deposited $2,250,000.00 of it in the Westbank entities in return for certificates of deposit. At that point, NAI apparently satisfied Wisconsin requirements for capitalization so long as the CD's remained free of liens or pledge obligation. Because Grossman was allegedly "affiliated" somehow in the Westbank entities and was also "Chair" of NAGL, (apparently Chair of the Board) (Amended Counterclaim ¶ 25), a step was taken to induce the Wisconsin Insurance Commissioner to approve the deposit of NAI's cash in Westbank. That step was issuance of a letter from a Westbank officer to the effect that the CD's were neither pledged nor would they offset any current or future loans at Westbank/Naperville. (Amended Counterclaim ¶¶ 24 and 25).[1]

In December 1988, Westbank/Naperville loaned $2,450,000.00 to NAGL. To secure that loan, despite the earlier letter, Westbank/Naperville was granted a security interest in the $2,250,000.00 in CD's issued by the Westbank entities to NAI, and in another unrelated CD. That pledge was "technically authorized by the Insurance Commissioner but only for use as collateral, not to paydown the loan to NAGL." (¶ 23).

In early July 1989, FDIC examiners were inspecting books of Westbank/Naperville. They found its $2.45 million loan to NAGL to be in excess of lending limits. The FDIC found the pledge of NAI CD's had not cured the matter because that pledge was unlawful under Wisconsin insurance regulations and law. Faced with an FDIC threat to classify the NAGL loan as at risk, thus risking continued viability of Westbank/Naperville, that bank liquidated the $2,250,000.00 in CD's that had been issued to NAI in July of 1989, and applied the proceeds to reduce the NAGL debt. This was done despite the alleged promise by it not to do so.

That was the beginning of collapse. The next month, August of 1989, the Wisconsin Insurance Commissioner learned that the NAI CD's were liquidated. He declared the insurance company to be undercapitalized. The next month, Bankers Trust called the entire NAPP loan, in part because of the foregoing events. Grossman had guaranteed that loan, and demands were made on him pursuant to that guarantee.

Various claims arose between the foregoing parties as a result of these events. All parties involved assertedly entered into a Release and Indemnification Agreement on September 20, 1990, all conditions of which have allegedly been met (¶ 52). Grossman claims that Counts 3 and 4 of the Westbank Adversary Complaint are in breach of the Release and Indemnification Agreement (¶ 54), but it is not clear why this is pleaded as part of the Amended Counterclaim.

Further pleaded assertions and details are referred to in the discussion that follows.

### Jurisdiction

The Amended Counterclaim does not plead this Court's jurisdiction as required by Fed. R.Bankr.P. 7008. However, it is clear that this matter is before the Court pursuant to 28 U.S.C. § 157, and is referred here under Local District Court Rule 2.33. The Court has core jurisdiction under 28 U.S.C. § 157(b)(2)(C).

---

1. It is alleged that this letter was issued March 25, 1988 (¶ 24), which would have placed it before the CD's were purchased "[d]uring 1988 and 1989" (¶ 23). That apparent contradiction is not explained in the pleadings.

### Standards on Rule 12(b)(6) Motions to Dismiss

Although Westbank cites no rule with respect to its motion for dismissal, it is presumed to be based upon Fed.R.Civ.P. 12(b)(6) (Fed.R.Bankr.P. 7012(b)).

In order for counterdefendants to prevail on their motion to dismiss, it must appear beyond a doubt from the pleadings that the counterplaintiff can prove no set of facts in support of his claims which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Gorski v. Troy,* 929 F.2d 1183, 1186 (7th Cir.1991). The issue is whether Grossman has pleaded a cause of action sufficient to entitle him to offer evidence in support of his claims. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The Court must consider both pleaded facts and reasonable inferences drawn from pleaded facts in a light most favorable to a plaintiff when reviewing a defendant's motion to dismiss. *Gorski v. Troy,* 929 F.2d at 1186; *Corcoran v. Chicago Park District,* 875 F.2d 609 (7th Cir.1989); *Ross v. Creighton Univ.,* 740 F.Supp. 1319, 1326 (N.D.Ill. 1990), *aff'd in part, rev'd in part,* 957 F.2d 410 (1992).

### DISCUSSION

Plaintiffs seek to assert a tort under Illinois law, and the parties agree that the law of Illinois governs. The Seventh Circuit has articulated the following factors which must be pleaded and proved under Illinois law in order to state a cause of action for intentional interference with prospective economic advantage ("intentional interference"):

(1) That the plaintiff had a reasonable expectation of entering a valid business relationship;

(2) That the defendant purposely interfered with and defeated that expectancy; and

(3) That the defendant's actions harmed the plaintiff.

*A–Abart Electric Supply Inc. v. Emerson Electric Co.,* 956 F.2d 1399, 1404 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 194, 121 L.Ed.2d 137 (1992) (citations omitted).

Counterdefendants assert that the Seventh Circuit has misread Illinois law, and there is instead a four-part test for the tort:

(1) plaintiff's reasonable expectation of entering into a valid business relationship; (2) defendant's knowledge of the expectancy; (3) defendant's intentional and malicious interference to defeat the expectancy; and (4) injury.

*Downers Grove Volkswagen v. Wigglesworth Imports, Inc.,* 190 Ill.App.3d 524, 527, 137 Ill.Dec. 409, 412, 546 N.E.2d 33, 36 (2d Dist. 1989) (citations omitted). The parties thus dispute whether the tort requires proof of defendant's knowledge of the expectancy.

■ The dispute as to which standard applies need not be resolved to decide the present motion. The counterplaintiff has not pleaded facts showing that he personally had expectancy of a business relationship with which counterdefendants interfered. Counterplaintiff was merely a 1% partner in a partnership (NAPP) that had an option to buy 50% of the NAI shares owned by NAGL, an entity controlled by NAPP. At best, the counterclaim might state a claim on NAPP's behalf, but Mr. Grossman does not plead that he owns any such claim or has any other standing to assert any possible partnership claim held by NAPP. Since that issue is dispositive, there is no need to resolve the other issues argued.

### Grossman Pleaded No Business Expectancy As Required For the Asserted Tort

Grossman argues that he had the reasonable business expectation, and relies on the following pleaded assertions, namely that:

— he was a 1% partner in NAPP.

— NAPP held an option to purchase 50% of NAI's stock.

— he reasonably expected NAPP to exercise its option to purchase NAI, an action that would have resulted in his receiving an economic advantage, such advantage apparently being an increase in value of his 1% partnership interest.

In paragraph 45, counterplaintiff further alleges that actions of the Westbank entities "were done maliciously and with knowledge that such actions were certain to interfere with and damage Grossman's business relationship with, and his expectancy of prospective economic advantage as a partner of, NAPP".

In his Response to the present motion, Grossman points to his allegation "[t]hat as a partner he had a reasonable expectation that the partnership NAPP would exercise its option to purchase NAI's stock". Response, p. 4, ¶ 2. From this, he claims to have satisfied the first element by showing that (using language from *A–Abart*) "Plaintiff [had] a reasonable expectation of entering a valid business relationship".

Illinois partnership law determines whether Grossman had an interest he could assert on his own behalf or whether he is really asserting an interest only the partnership could assert. Under Illinois law, a partnership is a contractual relationship controlled by terms of the partnership agreement under which it was formed, and by the Uniform Partnership Act, 805 ILCS 205/1 *et seq.* In particular, § 205/8 identifies partnership property as:

A. All property originally brought into the partnership stock or subsequently acquired, by purchase or otherwise, on account of the partnership is partnership property.

B. Unless the contrary intention appears, property acquired with partnership funds is partnership property.

Further, § 205/24 identifies the property rights of a partner: "The property rights of a partner are (1) his rights in specific partnership property, (2) his interest in the partnership, and (3) his right to participate in the management."

Section 205/25 identifies the rights of parties as to partnership property:

A. A partner is co-owner with his partners of specific partnership property holding as a tenant in partnership.

B. The incidents of this tenancy are such that:

(1) A partner, subject to the provisions of this act and to any agreement between the partners, has an equal right with his partners to possess specific partnership property for partnership purposes; but he has no right to possess such property for any other purpose without the consent of his partners.

Section 205/26 identifies the partner's interest: "A partner's interest in the partnership is his share of the profits and surplus, and the same is personal property."

There are a number of Illinois court precedents on the issue of partnership property. It is generally held that "each partner is possessed of a joint interest in whole, but does not own any separate part of partnership property." *Edwards v. Holcomb,* 67 Ill.App.2d 479, 214 N.E.2d 512 (4th Dist. 1966) (abstract).

Partnership capital "is partnership property, and thus it belongs to the partnership, not the individual partners.... Capital, therefore, is payable only to the partnership, not to the individual partners." *In re Estate of Johnson,* 129 Ill.App.3d 22, 27, 84 Ill.Dec. 322, 326, 472 N.E.2d 72, 76 (4th Dist.1984) (citations omitted).

Under Illinois law, partners as individuals do not own any specific part of partnership property nor do they have any specific interest in any particular asset. *Lueth v. Goodknecht,* 345 Ill. 197, 177 N.E. 690, 691 (1931); *Swirsky v. Horwich,* 382 Ill. 468, 470, 47 N.E.2d 452, 453 (1943); *Cook v. Lauten,* 335 Ill.App. 92, 97, 80 N.E.2d 280, 289 (1st Dist. 1948).

In 1931, the Illinois Supreme Court offered this definition of partnership property:

> A partnership estate is *sui generis*. While partnership property has many characteristics of an estate in common and of joint tenancy, yet the interests of the partners in the firm property is neither that of joint tenants nor of tenants in common. Each is possessed of a joint interest in the whole but does not own any separate part of partnership property. Each has an undivided interest in the property of the partnership only after the debts are paid.

*Lueth v. Goodknecht,* 345 Ill. 197, 200, 177 N.E. 690, 691 (1931) (citations omitted).

In 1943, citing the Uniform Partnership Act and *Lueth v. Goodknecht,* and another partnership case, the Illinois Supreme Court reiterated its definition:

> ... we held the interest of each partner in the partnership property, including lands, is the balance found to be due to him, after the payment of all partnership debts, and the adjustment of the partnership accounts between himself and the copartners.

*Swirsky v. Horwich,* 382 Ill. at 469, 47 N.E.2d at 453.

Three years later, an Illinois Appellate Court reversed a trial court ruling giving one partner sole possession of firm assets. The appellate ruling was based on *Swirsky v. Horwich,* and stated in pertinent part that

> ... each partner is possessed of a joint interest in the whole but does not own any separate part of the partnership property ... As partners neither party is entitled to exclusive possession or control.

*Cook v. Lauten,* 335 Ill.App. 92, 97–98, 80 N.E.2d 280, 282–83 (1st Dist.1948).

Firmly grounded in the rule of law articulated by the Illinois Supreme Court and Appellate Courts in the above-cited cases is a further rule relating to one partner suing on a partnership claim. A partner may not sue alone for that partner's share of a partnership claim. *American Central Railway Company v. Miles,* 52 Ill. 174 (1869); *Sinde-*

*lar v. Walker,* 137 Ill. 43, 27 N.E. 59 (S.Ct. 1891).

The Court in *Miles* reversed a trial court ruling which awarded Miles judgment on a partnership claim. The Court ruled as follows, reasoning:

> As to appellee's share of the sum due the firm of which he was a member, we are aware of no rule of pleading or practice which will authorize a recovery by an individual member of a firm in his own name on what his partners agree is his share of a debt due the firm. In all cases of indebtedness to a firm, the action must be brought by the members of the firm; nor does an agreement to divide the claim among themselves change the right. The debt is due the members of the firm jointly, and unless it be a negotiable instrument, the debt cannot be assigned at law, either in whole or in part, to one member of the firm. It then follows that appellee's interest in that claim against the company was only equitable, and the legal title was vested in the members of the firm, and they could alone sue and recover at law.

*American Central Railway Company v. Miles,* 52 Ill. 174 (1869).

In 1891, the Illinois Supreme Court in *Sindelar* held that an individual partner had no standing to sue a third party for conversion of partnership property:

> There is no averment that the copartnership between plaintiff and Hubka has been dissolved, or any settlement whatever had of their partnership affairs. The declaration, therefore, not only fails to show any individual title or ownership in plaintiff to said property, partnership business, or the profit or good-will thereof, which he says he lost, but affirmatively discloses a state of facts from which it appears that he had only a community of interest therein with his partner, who consented to said transfer, and all that was done by defendant in error.

*Sindelar,* 137 Ill. at 45, 27 N.E. at 59.

The Court applied basic partnership principles:

> A partner's right to partnership property is an ownership of all the assets of the firm

subject to the ownership of every other copartners; all of the partners holding all of the firm assets, subject to the payment of the partnership debts and liabilities. It is clear, therefore, that the individual interest of one partner in the firm property and business can only be ascertained by a settlement of the partnership. This rule applies to the interests of a partner in the profits or good-will of the partnership business as well as to the tangible assets of the firm. Until plaintiff's actual interest in the partnership has been determined there can be no ascertainment of his damages.

*Id.* (Citations omitted.)

The Court then ruled that "We are clearly of the opinion that on the facts stated in his declaration plaintiff has no standing in a court of law." *Sindelar*, 137 Ill. at 46, 27 N.E. at 293.

Those principles, announced over one hundred years ago by the Illinois Supreme Court, have since been followed as the rule of law in Illinois, even under the partnership acts since enacted.

In *In re Funneman*, the Bankruptcy Court held that partnership property was not property of the estate when one individual partner and not the partnership had filed for bankruptcy. 155 B.R. 197 (Bankr.S.D.Ill. 1993). While partners hold partnership property as tenants in partnership, incidents of the tenancy are limited so that no partner has the right to possess partnership property except for partnership purposes. *Id.* 155 B.R. at 199 (citations omitted).

*Funneman* relied on an earlier Seventh Circuit holding that a specific asset held by a partnership is not property of an individual partner's estate. *In re Pentell*, 777 F.2d 1281, 1285 (7th Cir.1985). *Pentell* held under the Illinois Partnership Act that the only "partnership" property before the court during an individual partner's bankruptcy is a partner's personal property interest in the partnership. *Id.*, 777 F.2d at 1285. With respect to any specific asset, the partner has no individual interest. Each partner has a joint interest in the whole. *Id.* (citations omitted).

According to Illinois law, as previously discussed, when a partnership owns property, the individual partners do not own any specific part of that property or have any specific interest in it. When a partnership has a cause of action for a tort claim or contract debt, an individual partner may not sue for that partner's share of the partnership claim.

Applying Illinois law to the counterplaintiff's allegations, it can be concluded that the partnership NAPP might have had a reasonable expectancy of entering into a valid business relationship by means of its option to purchase the NAI stock. However, any such expectancy belonged to NAPP, not Grossman. This expectancy was partnership property, not Grossman's individual property. If NAPP had purchased the stock of NAI, these stock certificates would have belonged to the partnership and not to the individual partner Grossman. Counterplaintiff has not pleaded that NAPP has wound up or that, as a partner, he ever succeeded to its rights.

Grossman, as an individual 1% partner, had an interest in the profits and surplus of the NAPP partnership. But Grossman as an individual held no options to purchase stock himself. NAPP did.

Grossman is the Counterplaintiff, personally, not as an agent or assignee of NAPP. Plainly, Grossman is suing in his individual capacity. As an individual, he has no claim or cause of action. Grossman continues to maintain his rights in partnership property as a tenant in partnership and his interest in the partnership. However, these rights do not include the right to assert any NAPP claim on his own personal behalf.

Therefore, counterplaintiff does not plead facts showing that he could possibly have standing to bring the asserted counterclaim. Since Grossman brings the action on behalf of himself, he has failed to allege his own prospective business relationship with any third party that was interfered with by the Westbank entities.

## CONCLUSION

Accordingly, Grossman has not pleaded and cannot plead the first element of his

cause of action, despite his two attempts to do so. Therefore, the Counterclaim will by separate and final order be dismissed.

